IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-297

No. COA21-27

Filed 6 July 2021

Beaufort County, No. 19-JA-140

IN THE MATTER OF: B.H.

Appeal by respondent from order entered 21 September 2020 by Judge Regina R. Parker in Beaufort County District Court. Heard in the Court of Appeals 8 June 2021.

*Miller & Audino, LLP, by Jay Anthony Audino, for Petitioner-Appellee Beaufort County Department of Social Services.*

*Elon University School of Law Guardian ad Litem Appellate Advocacy Clinic, by Senior Associate Dean Alan D. Woodlief, Jr., for guardian ad litem.*

*Lisa Anne Wagner for Respondent-Appellant Mother.*

CARPENTER, Judge.

¶ 1     Respondent-Mother appeals from a permanency planning order (the "Order") entered 21 September 2020 granting permanent guardianship of B.H. to her paternal aunt, E.H., and E.H.'s long-term partner, L.G., and ordering supervised visitation to Respondent-Mother and B.H.'s biological father. On appeal, Respondent-Mother contends the trial court failed to follow the statutory mandate prescribed in N.C. Gen.

Stat. § 7B-600(c) (2019) and N.C. Gen. Stat. § 7B-906.1(j) (2019). Specifically, she argues the trial court erred in granting guardianship to E.H. and L.G. without first verifying that both guardians understood the legal significance of the appointment of guardianship, as statutorily required. After careful review, we affirm the Order because there is competent evidence in the record to support the trial court's verification.

## I. Factual & Procedural Background

B.H. is the oldest of Respondent-Mother's four children and has a different father from her siblings.[1] The North Carolina Department of Social Services' engagement with Respondent-Mother's children dates back to 2015. On 4 February 2015, Respondent-Mother was arrested on drug-related charges in Carteret County while her two children were present in the car with her as she "conduct[ed] drug deals." Following Respondent-Mother's arrest, Carteret County Department of Social Services obtained legal custody of B.H. and her younger half-sister. E.H. and L.G. served as a relative placement for the two children from March 2015 to June 2016.

Nearly four years later, on 14 January 2019, the Beaufort County Department of Social Services ("DSS" or "Petitioner-DSS") received a report from the Craven County Department of Social Services alleging: (1) the children were dirty and

---

[1] None of B.H.'s three half-siblings is, nor is either of the children's fathers, a subject of this appeal.

unkept; (2) the children spoke about living in a camper with no water or power; (3) the family slept closely together in a van to keep warm; and (4) there was a warrant for Respondent-Mother's arrest for violating school attendance laws. After receiving the report, DSS provided in-home services to assist the family with enrolling the children in school and obtaining stable housing.

¶ 4 On 31 January 2019, DSS received information from the Carteret County Department of Social Services reporting that it had become involved with Respondent-Mother's family due to concerns she slept half the day, kept her two oldest girls in her bedroom, and did not properly care for her children. The family could not be located; therefore, DSS could not continue to provide its in-home services to the family.

¶ 5 On 15 October 2019, DSS received a report alleging improper care of juveniles due to Respondent-Mother's children not attending school. The report further alleged Respondent-Mother had just given birth to her fourth child, and the family had no stable housing. Concerns of past substance abuse by Respondent-Mother as well as by Z.H., the husband of Respondent-Mother and the father of B.H.'s three half-siblings, were also raised in the report. A social worker contacted Z.H. on 18 October 2019. Z.H. informed the social worker that the family was staying in a hotel and stated he would provide the hotel information later that evening; however, neither Z.H. nor Respondent-Mother provided the location of the family or otherwise made

themselves or the children available to the social worker. The social worker was unable to locate the family despite making diligent efforts. Because DSS could not locate the family during the assessment period, the 15 October 2019 report was closed on 27 November 2019.

¶ 6     On 5 December 2019, an additional report was made to DSS. DSS sent this report to the Onslow County Department of Social Services as the family was suspected of living in Onslow County with a family member. The report alleged the family was living with a registered sex offender, B.H. was not enrolled in school, and B.H. was in need of a physical examination. Again, the family could not be located; however, Onslow County Department of Social Services was able to make contact with Respondent-Mother by telephone, and she acknowledged the report.

¶ 7     On 10 December 2019, DSS received a similar report, which was based on B.H.'s lack of enrollment in school, her parents' failure to make her physical examination appointment so B.H. could enroll in school, and the family's homelessness and "couch surfing." The report also expressed concerns of the children's safety due to potential substance abuse by Respondent-Mother, Z.H., and Z.H.'s sister with whom the family was staying, as well as the possible presence of a registered sex offender in the sister's home. Due to DSS's allegations and concerns, including the possibility of the family fleeing out-of-state with the minor children, DSS sought emergency custody of the four minor children. DSS learned Respondent-

Mother was scheduled for treatment services at the Agape Center on 10 December 2019, and found the family at the location on that day. DSS obtained custody of the children at the facility with the assistance of the Washington Police Department. The Washington Police Department arrested Respondent-Mother based on three active arrest warrants related to violating school attendance laws and absconding from probation, which had been imposed in part because of a previous school truancy conviction. Respondent-Mother was placed in jail for a thirty-day sentence.

¶ 8        Following the events on 10 December 2019, DSS filed the same day a juvenile petition alleging neglect and dependency of B.H. by Respondent-Mother and B.H.'s biological father. Also on 10 December 2019, the trial court issued an order for nonsecure custody, which was filed 11 December 2019. The nonsecure custody order awarded placement authority to DSS, and a hearing was scheduled for 18 December 2019 to determine the need for continued nonsecure custody.

¶ 9        Upon the filing of the petition, all four children were placed in licensed foster homes. After B.H. and her older half-sister were placed in a home together, B.H.'s biological father requested during a team meeting with the social worker that a home study be completed on his sister, E.H. Consequently, Respondent-Mother asked that B.H.'s half-sister also be placed with E.H. since the siblings had already been placed in a foster home together. E.H. and L.G. agreed to be considered as a placement for B.H. only. The Carteret County Department of Social Services completed a home

study on their residence at the request of DSS on 4 February 2020, and the residence was recommended for placement of B.H. on 19 February 2020. The trial court ordered B.H. to be placed with E.H. and L.G. on 19 February 2020; B.H was placed in their home on 21 February 2020.

¶ 10        On 18 December 2019, the matter came on for hearing on the need for continued nonsecure custody before the Honorable Keith Mason. Judge Mason entered the Order on Need for Continued Nonsecure Custody the same day. The order concluded the best interests of B.H. would be served by continuing DSS's custody of the juvenile pending a further hearing and by allowing appropriate visitation. The trial court ordered the juvenile remain in the nonsecure custody of DSS pending further hearings and granted weekly supervised visitation to Respondent-Mother and B.H.'s father.

¶ 11        On 16 June 2020, the trial court held pre-adjudication, adjudication, and disposition hearings before Judge Mason on DSS's petitions alleging B.H. and her three half-siblings were neglected and dependent. Respondent-Mother was not present for the hearings. The trial court adjudicated the four children neglected and dependent. The trial court entered its disposition order the same day and found, *inter alia*, that "[t]he present risk of harm to the children if placed into [Respondent-Mother] and [Z.H.'s] home is high" based on the current report of neglect, Respondent-Mother's substance abuse issues, and the family's lack of stable housing. The trial

court made the following pertinent conclusions of law:

1. the juveniles cannot return home to any parent immediately, but it is possible that the children could return to a parent's home in the next six (6) months;
2. the appropriate plan for the juveniles is reunification with a concurrent plan of adoption;
3. the juveniles have received adequate care and supervision in their present placements;
4. [DSS] has made reasonable efforts aimed at reunification and in eliminating the need to remove the juveniles from the parents' custody; and
5. it is in the best interest of the juveniles that [DSS] continue to be responsible for their well-being.

¶ 12 The trial court ordered in the disposition order, *inter alia*, that physical and legal custody of the children remain vested in DSS with the children remaining in their current placements or as DSS deems appropriate; that Respondent-Mother and Z.H. receive psychological evaluations and comply with all recommendations, obtain and maintain stable housing and employment, complete parenting classes, and attend individual therapy; and that the permanent plan shall be reunification with a concurrent plan of adoption.

¶ 13 Respondent-Mother received her court-ordered psychological evaluation in August 2020. The evaluator recommended that Respondent-Mother receive "individual therapy sessions to address her discomfort with stability and her avoidance of situations she needs to address." The evaluator also noted "Respondent-Mother continues to be a risk for uprooting her family when adversity arises." The

report concluded that it was "improbable that [Respondent-Mother] is capable of sole caregiving to her children" until she addressed her issues, including her unstable childhood and adulthood, in therapy.

¶ 14        On 2 September 2020, the trial court held a permanency planning hearing before the Honorable Regina Parker.  Respondent-Mother testified that at the time of the hearing, she was not enrolled in any type of therapy, she had begun new employment the week prior, she had completed the first month of a one-year lease of a house, and the social worker had cited no problems with her home.  The social worker testified that Respondent-Mother had not attended therapy since April 2020 although she had reached out to her therapist; thus, she had not attended individual therapy as recommended in her August 2020 court-ordered psychological evaluation. The social worker further testified that although Respondent-Mother completed parenting classes online, the social worker still recommended a face-to-face parenting course.  The trial court considered concerns raised in Respondent-Mother's forensic psychological evaluation, her progress with her case plan, and the fact that B.H. had previously been placed in foster care.  On the date of the hearing, Judge Parker entered the permanency planning order, which concluded, *inter alia*: (1) reunification efforts with the child's parents are futile in that such efforts are inconsistent with the child's health and welfare; (2) the child cannot return home in the next six months; (3) it is not in the child's best interests to return home immediately; and (4) the child's

parental aunt E.H. and her partner L.G. are fit and proper persons to serve as B.H.'s guardians. Accordingly, the trial court granted permanent guardianship of B.H. to E.H. and L.G. and continued supervised visitation with B.H.'s father and Respondent-Mother. Respondent-Mother timely filed written notice of appeal from the Order.

## II. Jurisdiction

¶ 15 This Court has jurisdiction to address Respondent-Mother's appeal from the Permanency Planning Order pursuant to N.C. Gen. Stat. § 7B-1001(a)(4) (2019) and N.C. Gen. Stat. § 7A-27(b)(2) (2019).

## III. Issue

¶ 16 The sole issue on appeal is whether the trial court properly verified that B.H.'s paternal aunt and her partner understood the legal significance of their appointment as guardians of B.H., as required by N.C. Gen. Stat. §§ 7B-600(c) and 7B-906.1(j).

## IV. Standard of Review

¶ 17 This Court's "review of a permanency planning order is limited to whether there is competent evidence in the record to support the findings and the findings support the conclusions of law." *In re J.C.S.*, 164 N.C. App. 96, 106, 595 S.E.2d 155, 161 (2004) (citation omitted). "If the trial court's findings of fact are supported by competent evidence, they are conclusive on appeal." *In re Weiler*, 158 N.C. App. 473, 477, 581 S.E.2d 134, 137 (2003) (citation omitted).

¶ 18    "Questions of statutory interpretation are questions of law, which are reviewed *de novo* by an appellate court." *In re P.A.*, 241 N.C. App. 53, 58, 772 S.E.2d 240, 245 (2015) (citation omitted). "Under a *de novo* review, th[is C]ourt considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *In re A.K.D.*, 227 N.C. App. 58, 60, 745 S.E.2d 7, 8 (2013) (citation omitted) (emphasis added).

## V. Verification of Guardianship

¶ 19    Respondent-Mother argues the trial court reversibly erred when it granted guardianship to B.H.'s paternal aunt and her partner because the court failed to satisfy the statutory requirement that the trial court verify both guardians understand the legal significance of being appointed as guardians. Specifically, she contends the testimony from L.G. and the social worker concerning the guardianship was inadequate evidence of either L.G.'s or E.G.'s understanding of the legal significance of their appointment as guardians of B.H. Furthermore, she asserts "the record contains no evidence of court or home study reports" or other evidence which would support the trial court's findings that the guardians understood the legal significance of their appointment.

¶ 20    Petitioner-DSS argues "[t]he trial court sufficiently verified the guardians' understanding of the legal significance of being appointed as [B.H.'s] guardians . . . ." Similarly, the guardian *ad litem* maintains "[t]here was ample evidence before the

trial court from which it could verify that B.H.'s guardians understood the legal significance of guardianship."

¶ 21    After careful review, we hold the record contains sufficient evidence for the trial court to have properly verified that both E.H. and L.G. understood the legal significance of their appointments as B.H.'s guardians.

¶ 22    The Juvenile Code, Chapter 7B of the North Carolina General Statutes, governs the appointment of a guardian for a juvenile. "In any case . . . when the court finds it would be in the best interests of the juvenile, the court may appoint a guardian of the person for the juvenile." N.C. Gen. Stat. § 7B-600(a) (2019). When a court determines that the appointment of a guardian shall be the permanent plan for a juvenile, "the court shall verify that the person receiving custody or being appointed as guardian of the juvenile *understands the legal significance of the placement or appointment* and will have adequate resources to care appropriately for the juvenile." N.C. Gen. Stat. § 7B-906.1(j) (emphasis added); N.C. Gen. Stat. § 906.2(a)(3) (2019) (providing guardianship as one of the permanent plans that a court shall adopt at a permanency planning hearing); *see also* N.C. Gen. Stat. § 7B-600(c) (mirroring the guardian verification requirements provided in N.C. Gen. Stat. § 7B-906.1(j)).

¶ 23    Here, Respondent-Mother does not dispute the court verified B.H.'s appointed guardians to ensure they "have adequate resources to care appropriately for the juvenile." *See* N.C. Gen. Stat. § 7B-906.1(j); N.C. Gen. Stat. § 7B-600(c). Therefore,

our analysis of this case is limited to the issue of whether the court properly verified that the appointed guardians "understand the legal significance of the placement or appointment." *See* N.C. Gen. Stat. § 7B-906.1(j); N.C. Gen. Stat. § 7B-600(c).

¶ 24    This Court has held that the trial court is not required to "make any specific findings in order to make the verification[s]" mandated under N.C. Gen. Stat. § 7B-906.1(j) and N.C. Gen. Stat. § 7B-600(c). *In re J.E.*, 182 N.C. App. 612, 617, 643 S.E.2d 70, 73, *disc. rev. denied*, 361 N.C. 427, 648 S.E.2d 504 (2007). However, "the record must contain competent evidence demonstrating the guardian's awareness of [his or] her legal obligations . . . ." *In re K.B.*, 249 N.C. App. 263, 266, 803 S.E.2d 628, 630 (2016). The proposed guardians need not "demonstrate to the trial court a practical application of this understanding prior to or during the [permanency planning] hearing." *In re S.B.*, 268 N.C. App. 78, 88, 834 S.E.2d 683, 691 (2019). "It is sufficient that the court receives and considers evidence that the guardians understand the legal significance of the guardianship." *In re L.M.*, 238 N.C. App. 345, 347, 767 S.E.2d 430, 432 (2014) (citation omitted). Furthermore, when two persons are appointed together as guardians for a juvenile, there must be sufficient evidence before the trial court that both persons understand the legal significance of the appointment. *Id.* at 349, 767 S.E.2d at 433 (vacating in part an order for guardianship where "there was no evidence that the foster mother accepted responsibility" for the juvenile and affirming the order in part because the record

tended to show the foster father's desire to take guardianship of the minor child).

¶ 25    At a permanency planning hearing, any evidence may be considered, "including hearsay evidence as defined in [N.C. Gen. Stat. §] 8C-1, Rule 801, or testimony or evidence from any person that is not a party, that the court finds to be relevant, reliable, and necessary to determine the needs of the juvenile and the most appropriate disposition."  N.C. Gen. Stat. § 7B-906.1(c).  Our Court has concluded:

> [e]vidence sufficient to support a factual finding that a potential guardian understands the legal significance of guardianship can include, *inter alia*, testimony from the potential guardian of a desire to take guardianship of the child, the signing of a guardianship agreement acknowledging an understanding of the legal relationship, and testimony from a social worker that the potential guardian was willing to assume legal guardianship.

*In re E.M.*, 249 N.C. App. 44, 54, 790 S.E.2d 863, 872 (2016); *see In re S.B.*, 268 N.C. App. at 88, 834 S.E.2d at 691 (holding "[t]he testimony of the social worker and a court summary were relevant and reliable evidence" to support the trial court's finding that the guardian understood the legal significance of her appointment); *In re J.E.*, 182 N.C. App. at 617, 643 S.E.2d at 73 (concluding the trial court adequately verified that a minor child's grandparents understood the legal significance of their appointment as guardians based solely on a home study report).

¶ 26    In this case, the trial court made the following pertinent findings of fact in its Order:

73.  [E.H.] and [L.G.] are willing to serve as this child's guardians.

74.  Prior to this hearing, [E.H.] and [L.G.] have discussed between themselves the idea of serving as this child's permanent guardian. And, they have discussed their desire to serve as guardians with Social Worker Vinson.

. . . .

80.  [E.H.] and [L.G.] are fit and proper persons to serve as this child's guardians.

. . . .

> b. They understand the legal obligations to which they are assuming; and, they have articulated a willingness to become this juvenile's guardians.

Respondent-Mother does not argue that the aforementioned findings of fact do not support the conclusion of law that "[E.H. and L.G.] . . . understand the legal significance of being appointed the children's guardians . . . ." Rather, Respondent-Mother challenges finding of fact 80(b) on the grounds that it is "not supported by competent evidence in part, as there is insufficient evidence that the proposed guardians understood the legal obligation of assuming guardianship of B.H." We disagree.

Although E.H. was not present at the permanency planning hearing, L.G. was present and testified as follows:

> Petitioner-DSS's counsel: And have you and [E.H.] discussed taking custody or guardianship of the child?
>
> [L.G.]: We have.

Petitioner-DSS's counsel: How frequently have y'all discussed that?

[L.G.]: We have discussed it at length basically since she came back into our home just because none of us ever really want the situation to happen and when it happened for a second time you kind of get a pattern so we—we talked about it in case things weren't where we thought that they needed to be what we could do and that's—that's our stance.

Petitioner-DSS's counsel: And have y'all also had those discussions with the social worker in the case?

[L.G.]: We have.

DSS-Petitioner's counsel: And what is it that you understand that you're proposing to do?

[L.G.]: To take guardianship over [B.H.] and at that point we would facilitate the visits with the parents. That would not be under—I guess, right now DSS facilitates those visits and I believe that we would at that point then facilitate those visits.

Petitioner-DSS's counsel: And in regards to the guardian, what does the guardian do for a child?

[L.G.] Meet the child's needs. I know that that once came up but that's not what a child needs. A child needs to have a stable environment. They need an education. They need love and care constant and they need to be taught how to be successful human beings when they're able to leave home and that's what we want to teach is—for her never to repeat a cycle and to be in a similar position as we're all in today.

¶ 29      Respondent-Mother relies on *In re E.M.* in support of her argument that L.G.'s

testimony was inadequate evidence of the proposed guardians' awareness of the guardianship's legal significance. 249 N.C. App. 44, 790 S.E.2d 863 (2016). In *In re E.M.,* we held that there was "no evidence in the record [to] support[ ] the court's finding that either of the custodians underst[ood] the legal significance of the placement." *Id.* at 54, 790 S.E.2d at 872. Although only the wife in the custodial couple testified, she did not testify "regarding her understanding of the legal relationship" nor did the court examine her to confirm she understood the legal significance of the placement. *Id.* at 55, 790 S.E.2d at 872. Moreover, the record did not include any competent evidence to support the trial court's verification. *Id.* at 55, 790 S.E.2d at 872. Accordingly, the Court vacated the order of guardianship and remanded the matter for further proceedings. *Id.* at 55, 790 S.E.2d at 872.

¶ 30        We find the case of *In re E.M.* readily distinguishable from the case *sub judice.* Here, L.G. acknowledged that B.H. was returning to their home, which demonstrates E.H.'s and her awareness of their legal responsibilities as guardians from B.H.'s previous placement of over one year with them. Furthermore, unlike *In re E.M.*, there is evidence in addition to L.G.'s testimony. The social worker's testimony and the home study report substantiated L.G.'s contention that both she and E.H. understood the legal obligations of guardianship appointment.

¶ 31        In *In re J.E.*, our Court concluded that a home study report, which referred to both "maternal grandparents," was sufficient proof of both grandparents'

understanding of the legal obligations that accompany guardianship appointment. *In re J.E.*, 182 N.C. App. at 617, 643 S.E.2d at 73. The report explained the grandparents' desire to have structure and consistency in the child's life and noted that both grandparents "have a clear understanding of the enormity of the responsibility of caring for [the minor child]." *Id.* at 617, 643 S.E.2d at 73. The home study report also stated that "[the grandparents] are committed to raising [the child] and providing for his needs regardless of what may be required." *Id.* at 617, 643 S.E.2d at 73. We affirmed the trial court's order granting custody to the juvenile's grandparents. *Id.* at 619, 643 S.E.2d at 74.

¶ 32      In the instant case, the trial court "receive[d] and consider[ed]" competent evidence that both L.G. and E.H. were aware of the legal significance of being appointed as guardians. *See In re L.M.*, 238 N.C. App. at 347, 767 S.E.2d at 432. L.G. testified that she not only understood the role of a guardian, but she and E.H. had discussed the appointment at length with one another as well as with the social worker before deciding to take guardianship. Like the home study report in *In re J.E.*, which referred to the child's grandparents collectively, L.G. used the pronoun "we" in replying to DSS's counsel's questions; thus, her responses provided evidence of her and E.H.'s collective understanding of the appointment. *See In re J.E.*, 182 N.C. App. at 617, 643 S.E.2d at 73. L.G. stated that "she and [E.H.] want to teach" [B.H.] "how to be a successful human being[ ]" through love, care, education, and a

stable environment. She made clear that it was both her and E.H.'s intention to break the cycle of B.H.'s unstable living situations that had initially brought B.H. into their home in 2015. L.G.'s testimony demonstrates both she and E.H. are committed to raising B.H. and their understanding of the legal significance of being appointed as B.H.'s guardian.

¶ 33     L.G.'s testimony was corroborated by the social worker's testimony at the permanency planning hearing in which the social worker testified that she had conversations with both E.H. and L.G. regarding the role, and they understood the legal significance of guardianship:

> Petitioner-DSS's counsel: Ms. Vinson, have you had discussions with both [E.H.] and [L.G.] about assuming guardianship or custody of the child?
>
> Social Worker: Yes.
>
> Petitioner-DSS's counsel: And from your discussions with—with them, do they understand that the legal significance of that is?
>
> Social Worker: Yes.

¶ 34     At the hearing, there was no objection to the social worker's testimony; therefore, it is competent evidence. *See In re F.G.J.*, 200 N.C. App. 681, 693, 684 S.E.2d 745, 753–54 (2009). Nevertheless, Respondent-Mother argues that the social worker's "conclusory testimony is inadequate [evidence] to support the trial court's finding . . . ." This argument is without merit as our Court has held that an

affirmative response of "yes" to the question of whether a guardian understands the legal significance of guardianship is sufficient to satisfy the statutory requirement. *See In re P.A.*, 241 N.C. App. 53, 60, 772 S.E.2d 240, 245–46 (2015) (concluding a guardian's affirmative one-word response to the trial court's question of whether she understood the nature and legal significance of having the label of permanent guardian was sufficient evidence to support the trial court's finding regarding her understanding).

¶ 35        The trial court's verification is further supported by the 19 February 2020 home study report. In the home study report, the social worker stated that E.H. and L.G. have served as relative placements for B.H. in the past, and both "are aware of the time and involvement that is needed to care for [B.H.] . . . ." The home study report also noted E.H. and L.G. have "a personal commitment to each other that they hold in the same high regard as a legal marriage," and they "thoroughly discuss all issues and matters and make decisions together." Finally, the social worker stated E.H. and L.G. are willing to care for B.H. "for as long as needed."

## V. Conclusion

¶ 36        The testimony of L.G., the testimony from the social worker, and the home study report each provided competent evidence from which the trial court could verify that both B.H.'s guardians understood the legal significance of the guardianship appointment. We hold the trial court properly performed its statutory duty to verify

the guardians pursuant to N.C. Gen. Stat. § 7B-906.1(j) and N.C. Gen. Stat. § 7B-600(c).

AFFIRMED.

Judges DIETZ and MURPHY concur.